**STATE of Missouri, Respondent,**

v.

**William M. PETERS, Appellant.**

**No. WD 35989.**

Missouri Court of Appeals, Western District.

June 11, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied July 30, 1985.

L. Patrick O'Brien, Austin F. Shute, Kansas City, for appellant.

John Ashcroft, Atty. Gen., T. Chad Farris, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, C.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The defendant Peters was arrested in his residence on the charge of rape. The entry by the police for that purpose was without warrant to arrest or to search. When the defendant opened the door of the residence to the knock, they saw on a table inside, some five feet away, a handgun and next to the gun, some opaque bags with green leafy content, and other square packets. These items were seized and rooms of the house were systematically searched. One of the packets was found to contain cocaine. The defendant was charged with the possession of a controlled substance in violation of § 195.020, RSMo 1978, and was convicted. We determine that the entry into the home to arrest without a warrant was unlawful, and that the consequent seizure of the narcotics on the table was unlawful.

The case was tried to the court on the transcript of the evidence taken on the pretrial Motion to Suppress and on additional stipulated facts.

The victim Jane Cassady was raped at about 2 o'clock on the morning of January 9, 1983. She reported the incident to the police later that morning, at about 6 o'clock. The victim [and, presumably her husband] gave a party at the residence. The defendant was among the guests. She knew him only as "Bill," although they were acquaintances, and her husband had conducted business with Bill over a period of a year—the sale of a motorcycle included. The defendant "left to get some beer," and Jane Cassady accompanied him. He drove them in a blue Volkswagon to a residence north of I–29 on 112th Street off Prairie View Road in Platte County, and raped her there inside those premises. She did not know the address, but was able to describe the house and told officers that a tow truck was parked in the driveway. She described her assailant as "a little over 6 foot, 200 pounds, and brown hair, wearing a purple shirt and blue jeans." Ms. Cassady told the officers that she saw a revolver on a table, but that Bill never threatened her with it. The evidence does not explain how the victim was restored to her residence, or why the elapse of four hours between the time of the assault and the report to the police.

The police received the report at 6 o'clock that morning, arrived at the Cassady residence at about 6:20 a.m., and about an hour later, four armed police officers, in four separate cars, converged on the premises readily found from the description of location and appurtenances given by the victim. One officer was stationed at the rear of the premises, and the other three advanced to the front door [one armed with a shotgun]. They rapped on the door, the defendant opened, and answered affirmatively when asked whether his name was "Bill." The police informed him he was in arrest for rape. He made no resistance, but stepped back somewhat, the police then swarmed into the house and handcuffed him behind

the back. A table was open to view through the doorway, and on the table a handgun, some green leafy substance in clear, plastic bags, and another container with six folded packets. These were searched, and the entire house, in turn.

The defendant contends on appeal that the police entry into his home to arrest without a warrant or consent violates the Fourth Amendment protection against unreasonable searches and seizures, and so the evidence taken after the entry was unlawful and the conviction may not stand. We agree and order the defendant discharged.

The arbitrary invasion of the privacy of the home is the chief evil the Fourth Amendment [1] addresses. *United States v. United States District Court for the Eastern District*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). Thus, in the case of a dwelling, in terms that apply equally to seizures of property and seizures of persons, *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) lays down the principle [l.c. 590, 100 S.Ct. 1382]:

> "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." [emphasis added]

The Fourth Amendment, therefore, expounds a basic principle that searches and seizures inside a home without a warrant are presumptively unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 447, 91 S.Ct. 2022, 2028, 29 L.Ed.2d 564 (1971). The entry into a home to make an arrest or to conduct a search without a warrant, however, may be excused by exigency or consent. *Payton v. New York*, supra, 445 U.S., l.c. 590, 100 S.Ct. 1382; *Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981)

The prosecution argues that the police conduct was not an in-home arrest or, if so, then the entry to arrest without warrant was justified by exigent circumstances. The contention as formulated, is that the police officers were not in the residence when "they initially placed him [Bill] under arrest," and that they entered the dwelling only "because of actions by appellant himself: he backed toward a table and was within arm's length of a handgun resting on the table." Once entered to protect against the weapon [the necessary corollary of the argument must be], the police were authorized to seize the narcotics contraband in plain view.

■ That argument amounts to a contention that the arrest of the defendant was in a public place, and hence beyond the pale of *Payton* altogether. There is no reason to doubt that there was probable cause for the police to arrest the defendant for rape, or that if such arrest was executed in a public place, the defendant was amenable to custody—and to search as an incident—without a warrant and without infringement of the Fourth Amendment. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). An arrest made by entry into a dwelling of the suspect without a warrant—even on probable cause—however, is an altogether different matter. That is because the Fourth Amendment protects not only a liberty interest, but a privacy interest as well. *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967). A public arrest involves no invasion of privacy, and thus the probable cause that the suspect committed a felony suffices, on entrenched common law principles, to render the seizure of the person not *unreasonable* within the formulation of the Fourth Amendment, even without a warrant. *United States v. Watson*, 423 U.S. 411, 419, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976); *G.M. Leasing Corp. v. United*

---

1. The Fourth Amendment provides:
 "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, ..."

*States*, 429 U.S. 338, 354, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977).

The arrest encounter was described by officers of the police contingent assigned to the front door. The home was readily found from the description given by the victim. One of the four officers was posted at the rear door, and the other three approached from the front. The officers were armed, and one of the three wielded a shotgun. Sgt. Bennett recounted the sequence of events: He rapped on the front door, the door opened *inward,* and either Officer Bliss or Officer Teichmann asked:

"'Are you Bill?' or something to that effect, and he said, 'Yeah,' and, at that point, he was told that he was under arrest for rape, he backed off a little bit from the door inside, and we followed him then right on in ... He was then placed under arrest, and handcuffed."

Officer Teichmann recounted:

"Well, we knocked at the door, and the door opened up, and Mr. Peters was standing in the door, and the only thing I knew was, the suspect of the rape's name was supposed to be Bill, called—named Bill, and I said 'Bill,' and he said 'Yeah.' ... Well, he kind of stepped back about—into the house from the door, and naturally we surged right in, and took him under arrest."

Officer Bliss confirmed the other accounts of the episode:

"The defendant answered the door. At that time Officer Teichmann stated 'Bill,' —that was the name we were given as the suspect's name—and he answered 'Yes' or 'What,' I can't remember exactly, then, I believe, Officer Teichmann stated something like 'Well, you're under arrest for rape,' or something to that effect. At that time he kind of stood back, stepped back a little bit ... and, at that time, all three of us kind of rushed in around him and got him handcuffed at that point."

There is no contention that the *defendant* was not physically placed in his private premises when he opened the door, and that, since the door opened inward, he remained lodged within the private premises as the door opened wider. The testimony of Officer Teichmann confirms that the execution of the arrest—the physical caption of the suspect by handcuffs and other means—was conducted some three feet within the premises of the dwelling. The testimony of the officers agrees that whatever prompted Bill to "step back," that gesture was not understood as a resistance to the police presence, and their surge into the house was not induced by that movement. The prosecution argument is, however, that the police were *outside* the premises when the arrest was announced to Bill, vis-a-vis, and hence they executed a *public arrest* on probable cause—an exercise of police authority lawful even without a warrant.

 In terms of the general Fourth Amendment definition, a person is "seized" in arrest when—whether by means of physical force or show of authority—"a reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *State v. Dixon,* 655 S.W.2d 547, 552 (Mo.App.1983); [*see also* § 544.180, RSMo 1978]. The seizure of a person in a home, however, involves more than a show of authority, but also the breach of the entrance to the home—a sanctum the Fourth Amendment accords its peculiar protection. That special zone of privacy is most clearly defined by the delineated physical dimensions of the dwelling itself [*Payton v. New York,* supra, 445 U.S., l.c. 589, 590, 100 S.Ct. 1381, 1382]:

The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when *bounded by the unambiguous physical dimensions of an individual's home*—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth

Amendment] stands the right of a man to retreat into his own home and there to be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511 [81 S.Ct. 679, 682, 5 L.Ed.2d 734] (1961).

In this case, the police confronted the defendant at the front door, armed and with at least one weapon—a shotgun—drawn. They on the outside, he on the inside of the home. They asked his name, and then entered and captured him physically. In the circumstances of the encounter, a reasonable person would not have believed that he "remain[ed] free to disregard the questions and walk away" [*United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) ]—that is, he would have believed he was under arrest. In the circumstances of a home arrest, also—where the zone of privacy extends unambiguously to the physical interior of the home [*Payton v. New York,* supra, 445 U.S., l.c. 589, 100 S.Ct. 1381]—it is the location of the person arrested and not of the officer who arrests that determines whether the arrest occurred in the home. *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980) [l.c. 757]:

> "Otherwise, arresting officers could avoid illegal 'entry' into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the 'reach' of the arresting officers."

█ The prosecutor does not dispute that the physical caption of the defendant was executed within the unambiguous confines of the home premises. The argument the prosecution pursues is that, whatever the physical situs of the person of the defendant at the time he was taken in arrest, when "he answered the door to his home," the defendant relinquished any expectation of privacy due a dweller, hence

the arrest was a public event and a warrant was not necessary. Indeed, it is the essential purpose of the Fourth Amendment "to shield the citizen from unwarranted intrusions into his privacy." *Jones v. United States,* 357 U.S. 493, 497, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (1958). The privacy the Fourth Amendment protects, however, is not a subjective expectation, but an expectation of privacy "society is prepared to recognize as 'reasonable.' " *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967), Mr. Justice Harlan, concurring;[2] *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984); *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). On these principles, a dwelling is a place where a person has a legitimate expectation of privacy. *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980). A dweller who purposely conducts activity in the open, however, may relinquish even that expectation of privacy. So, in *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the defendant was standing in the frame of the open doorway to her house fully visible from a public street only a few feet away when the police arrived to arrest her. When they announced "police" and displayed their official identification, she retreated into the house, where the police pursued and seized her. The court determined that the arrest without a warrant, but on probable cause, was lawful because Santana had knowingly exposed her presence to the public, and hence the arrest was in a public place and "not in an area where she had any expectation of privacy." [*Santana,* l.c. 42, 96 S.Ct. 2409] So also, on the same principle, activity by the dweller in open fields—although appendages to the dwelling—are not places owed the reasonable expectation of privacy the Fourth Amendment protects

**2.** "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reason-

able.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited."

against governmental intrusion without a warrant. *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 1741[6, 7], 80 L.Ed.2d 214 (1984).

In the perspective of these principles, we respond to the contention of the prosecution that the defendant forfeited his Fourth Amendment expectation of privacy when he opened the door of his dwelling to a knock, and was there confronted by the police. That is to say [as transliterated into the terminology of *Santana* and *Katz*,[3] supra]: whether by the act of response to an anonymous knock and unannounced police presence, the defendant knowingly exposed his person to the plain view of the public, and hence—albeit still within the physical home premises—was in an area society accords no expectation of privacy.

▆ The prosecution agrees that a home arrest may be executed only with a warrant—absent exigent circumstances. An officer who comes to arrest without a warrant, therefore, stands no better at the door of a home than does any other respectable citizen. *State v. Seagull,* 95 Wash.2d 898, 632 P.2d 44, 47 (1981); *United States v. Vilhotti,* 323 F.Supp. 425, 431 (S.D.N.Y.1971); aff'd in part and rev'd in part, 452 F.2d 1186 (2d Cir.1971); cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972). In the usual conduct of every-day affairs, a dweller who answers to an anonymous knock opens the door to learn who is there, and to decide whether to let that person in. The purpose is not to expose the dweller to the public view, or to forfeit the option to deny the caller entry into the home [as the prosecution would have it], but to ensure privacy. If a protected expectation of privacy in a home has any meaning, the dweller must have a right to exclude those who are unwelcome [governmental officers without either a warrant or exigent reason for entry, included]. Thus, a dweller goes to open

the door to an anonymous knock to ensure privacy, and not to relinquish it. It may be that had the police requested, Bill may have consented to the warrantless entry for the purpose of arrest for rape. It may even be that when the door is opened to an announced police presence with an announced purpose to arrest [a decorum required by our § 544.200, RSMo 1978, for any home arrest—even with a warrant], the consent to enter is given unless expressly refused. Here, the anonymous knock, the confrontation and inquiry by armed policemen, the entry and the caption were an uninterrupted sequence, without even pause for the defendant to object to the intrusion into the home—even, were that a realistic possibility. To accede to the contention of the prosecution that a door opened to an anonymous knock relinquishes the expectation of privacy—and hence subjects the dweller to public arrest—is to enable the police by a mere rap on the door to contrive occasion to arrest without a warrant and so to circumvent the Fourth Amendment altogether.

▆ In *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), federal agents came to the home of a suspect to arrest without a warrant. As in the case before us, the officers knocked on the door and with weapons drawn confronted the suspect in the doorway—they outside the premises and he inside the home—asked to talk with him, and were even told to come in. The court determined that the arrest was consummated while the suspect was physically within the home, and therefore was unlawful under *Payton* because executed without either warrant or exigent circumstances. The opinion [l.c. 756] distinguished *Santana,* where the suspect was "standing within the frame of her doorway as the officers approached ... [and so] was exposed to public view" and therefore subject to public arrest without a

---

**3.** The principle is fully rendered in *Katz,* supra, 389 U.S., l.c. 351, 88 S.Ct. 511:

"What a person knowingly exposes to the public, even in his own home or office is not a subject of Fourth Amendment protection.

[Citations] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations]."

warrant.[4] The court held also, that in the circumstances of the armed police presence, the invitation to enter was not a free consent. Also, *United States v. Reed*, 572 F.2d 412, 423 (2nd Cir.1978); *State v. Counts*, 99 Wash.2d 54, 659 P.2d 1087 (banc 1983). We determine that the seizure of the defendant was an in-home, and not a public, arrest, an official exercise unlawful in the absence of warrant or exigent circumstances.

■■■■■ The prosecution argues, alternatively, that the warrant to arrest was excused for exigent reasons. The *exigent circumstances* exception to the warrant requirement for police incursion into a home to make an arrest is narrowly drawn. *Johnson v. United States*, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); *Payton v. New York*, 445 U.S. 573, 586 n. 24, 100 S.Ct. 1371, 1380 n. 24 (1980). The Fourth Amendment does not require the police to obtain a warrant in cases of *emergency*, if that delay would endanger life, allow a suspect to escape, or risk the destruction of evidence because of an imminent police presence. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Santana*, 427 U.S.

38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Thus, the condition of sufficient emergency to justify a warrantless entry into a home to make an arrest, under that formulation, is the hot pursuit or a chase of an armed felon in flight from the law. *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). The *exigent circumstances* principle has actually been applied only twice by the United States Supreme Court to excuse an arrest in a home without a warrant—in *Warden* and *Santana*, supra.

In *Warden v. Hayden*, supra, a report by two persons that an armed robber—who had just pilfered a business—was seen going into a residence justified police entry, made *within minutes* of the report, into the premises to arrest without a warrant—even though it was later determined to be the home of the suspect. The court determined that, in the circumstances, for the police to act with speed was essential [l.c., 387 U.S., 298, 87 S.Ct. 1645]: "The Fourth Amendment does not require police officers to delay in the curse of an investigation if to do so would gravely endanger their lives or the lives of others."

---

**4.** The prosecution cites *United States v. Mason*, 661 F.2d 45 (5th Cir.1981) for the proposition that a dweller who opens the door thereby relinquishes any expectation of privacy to the premises, and is subject to a lawful arrest by police without a warrant. The court, with no discussion nor expression of rationale, or even mention of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), simply held that the defendant was in a public place when the arrest took place, and hence the arrest was valid without a warrant. The opinion does not mention nor does that defendant argue *Payton*, and so it is quite probable that *Mason*—although decided shortly after *Payton*—was not placed before the court.

The defendant Mason was convicted of conspiracy to possess and pass counterfeit currency. The police arrested the common-law wife of the defendant for the attempt to pass a counterfeit $100 bill. She told the agents that her paramour Mason was the source, and that he had four more of the bills at their home. The common-law wife, and co-occupant of the home, conducted the agents to the dwelling, and Mason opened the door as he saw them approach [apparently by his intention and without

even a knock]. Mason told the police he had received the bills from one Gurode, and agreed to place a telephone call for the agents to tape. Mason also consented to a house search by the police.

The determination that the arrest was in public rests implicitly—but without discussion—on the fact that Mason opened the door to the police quite voluntarily as they approached in the company of the common-law wife—even before any knock. It approaches the fact situation in *Santana*, but bears little essential analogy to the appeal we consider—where the door was not opened in anticipation of a police presence already known and seen, but merely to an anonymous knock. We observe parenthetically that the police, in the circumstances, undoubtedly had the consent of the common-law wife co-occupant to *enter* the premises. We observe also that there was a ground under *Payton* for the police to enter to arrest Mason—the exigent reason that there was imminent danger that the counterfeit currency still in his possession [as just disclosed by the common-law wife] would be destroyed if Mason was not quickly taken in arrest. That exigency, on settled principles, excused the requirement of a warrant.

In *United States v. Santana,* supra, the police—on information that Santana was a narcotics supplier and the source of the substance purchased by undercover agent with marked money—went to the Santana residence with the purpose to arrest her. Santana was in the doorway of her residence, in open view, paper bag in had, when the police arrived. They displayed identification, shouted "police," but she turned and retreated into the house. The officers followed Santana through the open door, caught her, and narcotics spilled from the bag, and the marked money was found on her person. The United States Supreme Court, on the rationale that when the police first undertook to arrest her, Santana was in a public place and hence subject to arrest for probable cause without a warrant, determined that the suspect could not thwart arrest by police in hot pursuit by retreat into the home [l.c., 427 U.S., 43, 96 S.Ct. 2410]:

> The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest. We hold that it could not. In *Warden v. Hayden,* 387 U.S. 294 [87 S.Ct. 1642, 18 L.Ed.2d 782] (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons. This case, involving a true "hot pursuit," is clearly governed by *Warden;* the need to act quickly here is even greater than in that case.

■ The emergency which will justify the police to enter a home to make an arrest without delay [and hence without the formality of a warrant], therefore, is danger to life from a suspect still at large or escape of the suspect or the destruction of evidence of the recent crime induced by the imminence of the arrival of the police. The evidence does not sustain any such exigency. That is because there was neither threat to life from the suspect, nor of escape, nor was there any evidence of the rape to destroy.

■ The information known to the police at the time they acted to arrest did not excuse a warrant. The delay made necessary by that procedure gave peril of neither injury to person nor of escape of the suspect. There was report of a weapon in the home, but not as the means of the commission of the crime, or as a source of threat. Rape, of course, is a serious offense, and the police who come to arrest such a suspect are in greater danger when the person is armed. The danger of armed resistance, however, inheres in the arrest of any felon—and especially where the offense itself was an armed action. The rape was not an armed action. There was not that immediate need for police entry into the home to arrest as in *Warden,* supra, where the suspects were rampant armed robbers, and a threat to the life of anyone in the way. Here the immediacy of the events had vanished. The victim waited for four hours to report the rape, and the police conducted the arrest an hour and a half later. Thus, some five and one-half hours had elapsed since the rape. There was no basis for the police to conclude that the revolver was such an immediate threat to the public or to themselves as to require instantaneous response by the warrantless entry. The slight delay the warrant procedure entails could not add to the danger of the execution of an arrest deferred. Nor was the arrest justified by the exigency of hot pursuit [*Santana,* supra]. Nor was there the exigency of escape, or even the concern to preserve evidence [*Warden,* supra]. The identity of the suspect was readily known to the police from the husband of the victim, an acquaintance of some time. There was no suspicion of flight or escape in the offing to excuse an arrest warrant. A cordon of the police already available around the house was enough, in any event, to prevent that possibility during any delay that procedure entailed. The neglect of the police to obtain an arrest warrant was not prompted by any sense of emergency, but to avoid an inconvenience.

The prosecution resorts, not to the *exigent circumstances* principles enunciated by the United States Supreme Court in *Warden* or *Santana* [the only cases decided by that court on the exigent entry into a home to arrest without a warrant], but to a decision of a federal court of appeals—*Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970). That decision formulates a calculus of considerations which, when conjoined, defines *exigent circumstances* to justify the police to act without delay to enter a home to arrest without a warrant. These factors include a grave offense, an armed suspect, probable cause to believe the suspect committed the crime, cogent reason to believe that the suspect remains on the premises, a propensity for escape, and such others. These components considered, *exigent circumstances* were not demonstrated by that standard if for no other reasons than that: after a lapse of more than five hours from the act of rape, there was no basis for a cogent belief that the suspect was still on the premises; there was no ground to assume that the suspect was of a "propensity to escape," and the crime for which the suspect was subject to arrest was not an armed action. Whatever the validity of the *Dorman* exigency standard when formulated in 1970 [and acceptance has been qualified [5]], the pre-*Dorman* pronouncement by the United States Supreme Court in *Warden v. Hayden* (1967), supra, and the post-*Dorman* decisions of that court in *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), in *Payton v. New York* (1980) in *Steagald v. United States* (1981) and in *Welsh v. Wisconsin* (1984), supra, define *exigent circumstances* in terms—for reasons already given—which do not sanction the entry into the home for the warrantless arrest of this rape suspect. The entry by the police to arrest for rape was without authority of warrant to arrest or to search, and therefore was unlawful. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639

(1980). The defendant was convicted not for rape, but for the possession of controlled substances seen by the officers through the open door, and seized by them as evidence. The plain view doctrine, however, operates only when the police presence is authorized [*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)], therefore the seizure by the police of the narcotics open to observation on the table through the doorway consequent upon the unlawful arrest was also unlawful, and the conviction for possession of that controlled substance cannot stand. The right of an officer to prevent the seizure by a person in arrest of a weapon in the immediate vicinity rests on the lawfulness of that custody [*Chimel v. California*, 395 U.S. 752, 753, 89 S.Ct. 2034, 2035, 23 L.Ed.2d 685 (1969); *New York v. Belton*, 453 U.S. 454, 459, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768 (1981)], therefore, the sight of the weapon on the table was no occasion to discover, and then seize the narcotics on the table, or for the general search of the house which followed.

There was no excuse for the neglect of an arrest warrant issued by a detached magistrate on probable cause. The conviction for possession of a controlled substance rests on an illegal arrest, an illegal search, and illegal evidence. The defendant is discharged.

All concur.

**5.** *See* J. Harbaugh and N. Faust, *"Knock on Any Door"—Home Arrests After Payton and Steagald,* 86 Dick.L.Rev. 191, 224 et seq. (1982).