STATE of Missouri, Respondent,

v.

Ruben Fernandez
HERNANDEZ, Appellant.

No. 15801.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 9, 1989.

Kimberly Bonney Landman, Asst. Public Defender, Springfield, for appellant.

William L. Webster, Atty. Gen., Daryl R. Hylton, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant, facing trial by jury for possession of more than 35 grams of marihuana, § 195.020, RSMo 1986, requested the trial court to assess punishment if appellant were found guilty. § 557.036.2(1), RSMo 1986. The jury returned a verdict of guilty; the trial court fixed appellant's punishment at five years' imprisonment. § 195.200.1(1)(b), RSMo Supp.1987. This appeal followed.

Appellant maintains the trial court erred in (1) refusing to declare a mistrial when the prosecutor commented during closing argument on appellant's failure to testify, (2) denying appellant's motion to suppress evidence improperly obtained without his consent, and (3) overruling appellant's motion for judgment of acquittal. We address the second point first.

At a pretrial hearing on appellant's motion to suppress, Officer Paul Carrington of the Springfield Police Department testified that around 4:30 or 5:00 p.m., October 28, 1987, he received a call from Special Agent Curtis Fair of the United States Customs Service in Kansas City. Fair informed Carrington that his (Fair's) agency's office in El Paso, Texas, had received information from an employee of the Grey-

hound bus company that four packages possibly containing a controlled substance had been placed on a bus in El Paso destined for Springfield. The packages were described as "two black footlockers and two cardboard U–Haul type packages that were heavily taped." They had baggage claim tickets on them, but no identification tags, and smelled "strongly of mothballs." Asked the significance of that scent, Carrington replied, "[T]o conceal the odor of the controlled substance."

Carrington was informed by a Greyhound clerk in Springfield that a bus from El Paso was due to arrive that night. Carrington went to the bus terminal and examined the baggage that arrived on that bus but saw nothing matching the descriptions he had received. Another bus from El Paso was due the following morning. Carrington asked Greyhound management to call him when it arrived.

The remainder of the State's evidence on the motion to suppress—appellant presented no evidence on the motion—paralleled the State's evidence at trial. As appellant's third point (to be discussed later) challenges the sufficiency of the evidence to support the verdict, we henceforth recount the evidence presented to the jury.

About 8:30 to 9:00 a.m., the next day Greyhound personnel informed Carrington by phone that some packages had arrived. Carrington, accompanied by Detective Ray Fite, went to the bus terminal and observed two identical black footlockers and two identical large cardboard boxes. Each bore a claim ticket but no tag with a name or address. Each "had a strong odor of mothballs." Each footlocker was secured by a padlock opened by key. Carrington and Fite waited about an hour and a half to see whether anyone was going to claim the items. No one appeared. After discussion with Greyhound management, Carrington and Fite went to the police station.

Sometime after noon appellant and another man, referred to in the transcript as "Hansen," entered the bus terminal and presented claim checks for the four parcels to Greyhound ticket agent Joe Medley. Per instructions given him earlier, Medley told the duo their luggage was not in yet. Then, outside the pair's hearing, Medley phoned Carrington "that someone had come to claim the trunks and boxes."

Medley then "went back up front" and told appellant and his companion that the bags had been mishandled and had gone to Fort Leonard Wood, but were being freighted back to Springfield. Medley, in the pair's presence, feigned a phone call to an agent at Fort Leonard Wood in which he (Medley) was assured the parcels had left that location some 40 minutes earlier en route to Springfield. Medley told appellant and Hansen the parcels would arrive in 25 to 35 minutes, and they "could hang around and wait or they could leave and come back and claim their bags." Appellant and Hansen said they would come back. Medley described their demeanor as "nervous."

Carrington returned to the bus terminal where he was joined by Fite and Sergeant Steve Hamilton of the Springfield Police Department. The trio put on Greyhound employee shirts supplied by Greyhound management and awaited the return of appellant and Hansen.

The duo appeared at the baggage counter some 10 to 20 minutes later. Medley told them their baggage had come in, and that because the parcels were heavy they would be placed on a cart and taken to the back door. Hamilton and Carrington loaded the two footlockers and two boxes on a "four-wheel cart" and pushed it outside the terminal to an automobile to which they were directed by appellant and Hansen. Upon reaching the vehicle Hamilton asked, "Do you need any help?" The two men, according to Hamilton, each replied no, that they could handle it. The pair then took the four parcels from the cart and placed them in the rear passenger seat and the trunk of the automobile.

At that point, testified Hamilton, he said: "Gentlemen, we are Springfield police officers. We would like to talk to you for a few minutes." Hamilton and Carrington simultaneously displayed their police badges.

Hamilton testified Hansen began "moving quickly to the open left front door of the vehicle." Hamilton thereupon drew his service revolver and stated, "Stop, please." Hansen obeyed the command, and Hamilton pointed his revolver at the ground. Hamilton then asked appellant and Hansen to place their hands on the vehicle, which they did. Asked why he gave that command, Hamilton replied, "I was afraid that weapons might be readily available to them."

Carrington testified he and Fite also drew their weapons because of Hansen's movement.[1]

Once appellant's hands and those of Hansen were clearly visible on top of the automobile Hamilton announced, "You're not under arrest but I'm going to advise you of your rights under the *Miranda* ruling." Using a card, Hamilton informed appellant and Hansen of the rights spelled out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Hamilton then asked both individuals whether they understood those rights. Appellant, according to Hamilton, replied, "Yes." Noticing that appellant spoke with "[o]ther than an Ozark accent," Hamilton asked appellant if he understood English. Appellant answered, "Yes."

Hamilton next asked each person who owned the boxes. Hamilton quoted appellant as responding, "They are not mine." Then, this:

"Q And when he said that, what, if anything, did you say to [appellant]?

A I stated, 'You had the baggage claim tickets, didn't you?'

Q And what did [appellant] say after you had asked him about whether he had the baggage claim ticket?

A He replied, 'Yes.'

. . . .

Q ... [A]fter the question about the baggage claim tickets, Sergeant Hamilton, what, if anything, did you ask [appellant]?

A I asked him then that, 'These are your boxes then, aren't they?'

Q And what did he reply?

A He replied, 'Yes, they are.'

. . . .

Q After he had stated that the objects were his, what happened?

A I asked him if I could search the boxes.

Q And did you advise him of any other rights when you asked him that?

A Yes.

Q What did you advise him?

A I immediately followed that question of asking to search the boxes with, 'You have a constitutional right to refuse to allow me to search these boxes.'

Q And what did [appellant] reply to that?

A 'Yes.'

Q And what did you then ask after—after that?

A I said, 'Keeping in mind your constitutional right to refuse to allow me to search these boxes, do I have your permission to search the boxes?'

Q What did [appellant] say then?

A He replied, 'I don't know. Should I talk with a lawyer?'

Q And what did you reply to that answer of [appellant]?

A I stated, 'That's up to you. You have that right. You have the right to refuse to allow us to search these boxes.'

Q And after that what did you say?

A I said, 'Do you mind if we search the boxes?'

Q And at that point what did [appellant] say?

A He replied, 'Yes.'

Q Yes what?

A He replied, 'Yes.' I then asked, 'Yes, you do mind,' to which he replied, 'No, I don't mind.' "

Carrington thereupon removed one of the cardboard boxes from the automobile and opened it. Inside were several smaller packages which had been taped. Carring-

---

1. At the hearing on the motion to suppress, Carrington testified it was he who drew his revolver and ordered Hansen to place his hands on the car, and that Hamilton did likewise with appellant.

ton cut one of them open and discovered a brown leafy substance he believed to be marihuana. He immediately advised appellant and Hansen they were under arrest for possession of marihuana. Carrington searched appellant, finding a copy of a bus ticket from El Paso to Springfield.

The footlockers and cardboard boxes were taken to police headquarters. Using a pair of bolt cutters to remove the padlocks from the two footlockers, police extracted their contents and the contents of the two cardboard boxes. Laboratory analysis confirmed that the material in all four containers was marihuana, weighing approximately 149 pounds in the aggregate.

Appellant's second point:

"The trial court erred when it denied [appellant's] motion to suppress the evidence because the evidence was obtained improperly without the consent of [appellant] in violation of [his] Fourth Amendment rights against unreasonable searches and seizures in that such evidence was obtained by the threat of a gun and without probable cause or reasonable suspicion."

■ Appellant concedes the Fourth Amendment to the Constitution of the United States permits consensual searches conducted without a warrant so long as the consent to the search is voluntary and not the product of duress, coercion or fraud. *State v. Johns,* 679 S.W.2d 253, 261[12] (Mo. banc 1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Whether there was a voluntary consent is to be determined by the totality of the circumstances. 679 S.W.2d at 261. When the State seeks to justify a warrantless search on the basis of consent, it must prove by a preponderance of the evidence that the consent was voluntarily given. *Id.* at 261[13].

Appellant cites *State v. Young,* 425 S.W.2d 177, 181 (Mo.1968), for the proposition that consent does not exist when one *submits to the will of the police* where they manifest a firm determination to carry out a search. In *Young* the State sought to uphold a search of the trunk of the ac-

cused's automobile on the ground of consent. The Supreme Court of Missouri held the search unlawful, noting the following evidence:

"Defendant said he agreed to open the trunk, but not until he had told [the officer] he did not want to open it to begin with, that he 'didn't like people looking through my private stuff', but the police said 'We are going to be looking at them now whether you like it or not', and rather than have the car 'mistreated', defendant opened the trunk." *Id.* at 179.

Such circumstances do not exist in the instant case. Hamilton's testimony, corroborated by Carrington and uncontradicted by appellant, was that Hamilton told appellant he was not under arrest, and informed appellant twice that he had the right to refuse permission to search the parcels. There was no evidence that Hamilton or any other officer manifested a determination to search the parcels whether appellant liked it or not.

Appellant also refers us to *State v. Witherspoon,* 460 S.W.2d 281, 287–88 (Mo.1970), where it is said that when the State seeks to rely upon consent to justify the lawfulness of a search, the burden of proving that the consent was freely and voluntarily given cannot be discharged by showing no more than acquiescence to a claim of lawful authority. In *Witherspoon,* however, the person who consented to the search was not advised of his Fourth Amendment rights, and there was no evidence in the record indicating he knew and understood he had any such rights. *Id.* at 289. In the instant case, as noted above, Hamilton made it plain to appellant that he had a constitutional right to refuse to allow the officers to search the parcels.

In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court of the United States upheld a trial court determination that the accused freely and voluntarily consented to a search of her person. 446 U.S. at 559–60, 100 S.Ct. at 1880, 64 L.Ed.2d at 513. The principal opinion said:

"Although the Constitution does not require 'proof of knowledge of a right to refuse as the sine qua non of an effective consent to a search,' [citation omitted] such knowledge was highly relevant to the determination that there had been consent. And, perhaps more important for present purposes, the fact that the officers themselves informed the [accused] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive." 446 U.S. at 558–59, 100 S.Ct. at 1879, 64 L.Ed.2d at 512.

Appellant argues that inasmuch as he was held "spread-eagle" across the side of the automobile by officers with drawn guns, and was never told he had the right to leave, the totality of the circumstances demonstrates his consent to the search of his packages was not freely and voluntarily given.

Upon review of a trial court's ruling on a motion to suppress evidence, the facts and reasonable inferences arising therefrom are to be stated favorably to the order challenged on appeal. *State v. Blair*, 691 S.W.2d 259, 260[1] (Mo. banc 1985), *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). The reviewing court is free to disregard contrary evidence and inferences, and is to affirm the trial court's ruling on a motion to suppress if the evidence is sufficient to sustain its finding. 691 S.W.2d at 260[2].

In *State v. Grannemann*, 715 S.W.2d 563 (Mo.App.1986), police officers, pursuant to an arrest warrant, arrested the accused outside his apartment, then took him inside where they arrested his brother per an arrest warrant. The two arrestees were handcuffed and given the "*Miranda* warnings." *Id.* at 564. An officer then asked whether he could search the apartment. The accused answered, "go ahead." The search produced evidence used against the accused to obtain a conviction of selling marihuana. Affirming the conviction, the Eastern District of this Court held that the fact the accused was under arrest at the time he gave his consent to the search is not enough to establish that the consent was involuntary. *Id.* The accused argued, however, that the presence of five officers, the handcuffing of the accused and his brother, the failure to inform them they had a right to refuse the search, and the absence of written consent established there was no reasonable basis for the trial court's finding that the consent was voluntary. Rejecting the argument, the Eastern District held that while those factors were relevant in determining whether, in the totality of the circumstances, the accused's consent was voluntary, a consent is not necessarily involuntary simply because there is more than one officer present and the suspect has already been handcuffed. *Id.* at 564–65. Noting that the accused was in his own home and with his brother, that there was no evidence that the officers overemphasized their authority, that none of the officers drew their weapons, and there was no evidence the officers tricked the accused into consenting, the Eastern District concluded the trial court did not act unreasonably in finding that the accused's consent was voluntarily given and was not the product of coercion. *Id.* at 565.

In the instant case neither appellant nor Hansen was handcuffed at the time Hamilton asked appellant for permission to search the four parcels, appellant and Hansen were specifically told by Hamilton they were not under arrest, and Hamilton twice informed appellant he had the right to refuse permission to search the parcels. In these respects the evidence demonstrating voluntariness of appellant's consent is stronger than the evidence in *Grannemann*. Here, however, the officers had drawn their weapons prior to requesting appellant's consent to search, while in *Grannemann* no weapons were drawn.

It is inferable, though, that the officers here did not display their weapons in order to induce consent to search. Hamilton testified that when Hansen made his move toward the open front door of the automobile Hamilton feared weapons might be readily available, hence his command to Hansen to stop and his directive that both men place their hands on the vehicle.

Hamilton, it will be recalled, testified his revolver was pointed at the ground during the dialogue with appellant about the search.

Courts in other jurisdictions have upheld searches as consensual where the consent was given after officers had drawn their guns. *United States v. Sullivan*, 321 F.Supp. 597 (S.D.N.Y.1971); *State v. Patterson*, 58 Haw. 462, 571 P.2d 745 (1977); *United States v. Taibe*, 446 F.Supp. 1142 (E.D.N.Y.1978), *aff'd without opinion*, 591 F.2d 1333 (2d Cir.1978), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1013, 62 L.Ed.2d 752 (1980); *People v. Williams*, 114 Cal.App.3d 67, 170 Cal.Rptr. 433 (1980); *Myers v. State*, 627 S.W.2d 527 (Tex.App.1982); *People v. Randle*, 133 Mich.App. 335, 350 N.W.2d 253 (1984). In *Randle* the accused and a companion, while riding in an automobile, were stopped by state troopers on suspicion of kidnapping and assault. The suspects were ordered out at gunpoint, spread-eagled against the front of the vehicle, and patted down for weapons. 350 N.W.2d at 254. One of the troopers stated that the accused consented to a search of the vehicle after being informed he had the right to refuse. The search produced a shotgun and other evidence. The trial court denied the accused's motion to suppress, finding he had consented to the search. The ruling was upheld on appeal despite the fact that throughout the incident the troopers had their guns drawn. *Id.* at 255.

In denying appellant's motion to suppress in the instant case the trial court stated:

"One of the things the Court feels that the record should include is the fact that the two officers in question are not characteristic of the bully, boisterous type of officer. Indeed, Sergeant Hamilton was a quiet-spoken, the Court felt, honest, candid sergeant from the police department, somewhat slight in build and both seemed to the Court to be very careful in their responses in an effort to be completely candid and honest."

Given the totality of the circumstances, and mindful that we are to affirm the trial court's ruling if the evidence is sufficient to sustain its findings, we hold that the evidence amply supports the trial court's denial of appellant's motion to suppress. In so holding we do not ignore *State v. Jacobs*, 704 S.W.2d 300 (Mo.App.1986), cited by appellant. There the accused (a woman), after an illegal arrest, surrendered a switchblade knife to the police. She testified she did so because she became fearful a male officer was going to "strip search" her. The knife formed the basis for a charge of carrying a concealed weapon. The trial court sustained the accused's motion to suppress; the State appealed. Applying the rule that upon review the facts and reasonable inferences arising therefrom are to be stated favorably to the order challenged on appeal and that the reviewing court is to affirm the trial court's ruling if the evidence is sufficient to sustain it, the Eastern District of this Court upheld the suppression. The facts in *Jacobs* are obviously unlike those before us. Appellant's second point is denied.

His third point:

"The [trial] court erred in overruling [appellant's] motion for directed judgment of acquittal both at the close of the State's case and at the close of all the evidence for the reason that the evidence was insufficient to show that [appellant] knowingly possessed marijuana found in the locked footlockers and the wrapped boxes because [appellant] had no control over the locked trunks or boxes and to which he lacked keys or other means of access to."

When the State rested its case appellant moved for "a directed judgment of acquittal." The trial court denied the motion. Appellant rested without offering evidence, and renewed the motion. It was again denied.

Appellant emphasizes there was no evidence that (1) he had possession of the keys to the padlocks on the two footlockers, (2) his fingerprints were found on any of the packages, (3) any of the parcels bore tags carrying his name, or (4) he attempted to flee when the officers identified themselves. Appellant adds that the packages

did not smell of marihuana, and that the claim tickets indicated the packages could have been put on the bus not only at El Paso, but also at Wichita Falls or Oklahoma City. These factors, says appellant, demonstrate the evidence was not substantial enough to show he had control or knowledge of the contents of the boxes.

Appellant cites *State v. Barber*, 635 S.W.2d 342, 343[2] (Mo.1982), which holds that to sustain a conviction for possession of a controlled substance the State must prove that the accused knowingly and intentionally possessed it. To meet that burden, conscious, intentional possession, either actual or constructive, must be established, and the evidence must also show that the accused was aware of the presence and nature of the substance. *Id.*

While we do not question the principles declared in *Barber*, its facts are vastly different than those here.

In *Barber* the accused and two other adults were found by officers in a bedroom of an apartment. Over 1,000 contraband pills and capsules were stacked on the floor, arranged in individual piles by color, size and type. The apartment was rented to one Ward. He, his wife, and two other adults were elsewhere in the apartment at the time the officers entered. Pointing out there was no evidence that the accused— one of seven adults in the apartment at the time of the arrest—had regular use of the bedroom, and no showing as to how long he or the drugs had been there, the Supreme Court of Missouri held the evidence was insufficient to support the accused's conviction. *Id.* at 344–45.

Appellant also cites *State v. Bowyer*, 693 S.W.2d 845 (Mo.App.1985), but it is likewise factually dissimilar to the instant case. In *Bowyer* the accused was convicted of possession of marihuana found by an officer in the console of an automobile being driven by the accused. His estranged wife, a passenger in the vehicle, testified that no one except her had access to the vehicle, and that the accused was driving it only because he had asked for a ride to a nearby village. The wife explained she had confiscated the marihuana from her brother sev-eral days earlier, and had put it in the console because of her three children at home. That testimony was consistent with the accused's explanation to the officer at the time the marihuana was found. The Western District of this Court held the evidence was insufficient to prove conscious possession of the marihuana by the accused.

In determining the sufficiency of the evidence to support the verdict we consider the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that appellant was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340 (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

In the instant case appellant admitted to Hamilton that he (appellant) had the claim tickets for the parcels and that the parcels were his. A copy of a bus ticket from El Paso to Springfield was found on appellant. There were approximately 149 pounds of marihuana in the four containers, and no evidence of anything else except mothballs. The smaller packages in the containers had been individually taped. The instant case is not one in which someone could have placed a small quantity of marihuana in appellant's luggage unbeknownst to him.

We hold the evidence was sufficient to support a finding that appellant had conscious actual possession of the marihuana, and that he was aware of its presence and nature. Appellant's third point is denied.

His first point:

"The trial court erred to [appellant's] prejudice in overruling defense counsel's

motion for mistrial on the basis of remarks made by the State's attorney during his closing argument regarding [appellant's] failure to present any evidence in his own behalf because such remarks were improper in that they infringed on [appellant's] right not to testify in violation of the Fifth Amendment to the United States Constitution's protection against any negative inferences being drawn from the refusal to testify."

During the first segment of the prosecutor's closing argument he said:

"You can also assume that a person knows what is in his baggage. That is exactly what we have here. A very clear case, a very, very clear case. There's no question about that. But I do want to talk about it because it is the matter that is in direct evidence and some people do have trouble with the circumstantial evidence.

There is no contrary evidence. There is no evidence that the defendant believed that he had clothes. There is no evidence that the defendant believed that he had mothballs."

At that point appellant's lawyer, outside the jury's hearing, objected that the argument was a comment on appellant's right not to testify. Counsel asked the trial court to instruct the jury to disregard the prosecutor's comment, and moved for a mistrial. The trial court admonished the jury to disregard the prosecutor's comment "in regard to there being no contrary evidence to suggest what defendant believed to be true," but denied the motion for mistrial.

▮ It is firmly embedded in the law that a prosecutor may not comment on an accused's failure to testify. *State v. Sidebottom,* 753 S.W.2d 915, 920 (Mo. banc 1988), *cert. denied,* — U.S. ——, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); § 546.270, RSMo 1986; Rule 27.05(a), Missouri Rules of Criminal Procedure (19th ed. 1988). This rule does not prohibit a prosecutor from making reference to the accused's failure to offer evidence. 753 S.W.2d at 920. It proscribes only direct and certain

references to the accused's failure to testify. *Id.*

▮ Appellant argues that the prosecutor's comments constituted a direct reference to appellant's decision to not testify.

In *State v. Frankoviglia,* 514 S.W.2d 536, 541[5] (Mo.1974), it is said:

"The key words of the rule and statute are 'accused' and 'testify,' and the test is whether the jury's attention was called to the accused's failure to testify. [Citations omitted.] The cases consistently require for reversal of a conviction that there be a direct, nonambiguous and unequivocal prosecutorial comment on the failure of the defendant to become a witness."

Appellant directs us to three decisions of the Court of Appeals that came after *Frankoviglia* and prior to *Sidebottom: State v. Reed,* 583 S.W.2d 531 (Mo.App.1979); *State v. Cokes,* 682 S.W.2d 59 (Mo.App.1984), and *State v. Ward,* 702 S.W.2d 545 (Mo.App. 1985). In *Reed* the prosecutor argued: "There is not a single witness who took the stand who is on trial. Bryan Reed is on trial." 583 S.W.2d at 533. This was held to be a direct reference to the accused's failure to testify. *Id.* at 534. In *Cokes* the prosecutor argued: "There is a lot of talk about the rights of the defendant. The defendant has the right not to testify." 682 S.W.2d at 60. The accused objected and moved for a mistrial. The trial court overruled the objection. The conviction was reversed and the case was remanded. In *Ward* the prosecutor said: "The defendant can take the stand himself and testify about that." 702 S.W.2d at 546. This was held to be a direct and certain reference to the accused's failure to testify. *Id.* at 547[1].

In *Sidebottom* the prosecutor stated in closing argument:

"Mr. McMullin [defense counsel] said he was going to put on evidence in his opening statement and he didn't do that. So you can throw out everything he said in his opening statement, because he didn't put on any evidence.

And, members of the jury, that's what we're talking about here. The instruc-

tion says, 'The opening statements of attorneys are not evidence.' Where is your evidence, Mr. McMullin? What do you do when you don't have a defense ...

You badger, you cross-examine, you yell and scream at the State's witnesses because that's all you can do." 753 S.W.2d at 920–21.

The Supreme Court of Missouri held the prosecutor's comments were well within the permissible guidelines for closing argument. *Id.* at 921.

In *State v. Bohanon,* 747 S.W.2d 294 (Mo.App.1988), the accused was convicted of sexually abusing two girls. No one other than those three was present when the crimes allegedly occurred. The prosecutor's final argument included this:

"The evidence is what the State of Missouri presented to you.... Because the only evidence you heard came from the State of Missouri's side.

. . . .

Think of the evidence. What was the evidence? Was there any conflicting, or any negating evidence at all that you heard today? Think back. Is there anything at all to refute what we said happened out there, what the little girls said happened out there, what the doctor verified....

. . . .

Really there's no refuting any of this.... You were not presented another side of the story, because I submit to you there was no other side of the story." *Id.* at 299.

The trial court denied the accused's motion for mistrial. On appeal this Court held the State's argument was a permissible statement that the evidence was uncontradicted. *Id.*

In the instant case appellant maintains he was the only one who could testify as to what he believed, hence the prosecutor's comment focused the jury's attention on his failure to testify.

While appellant's thesis may appear plausible, we are unpersuaded he was the only possible source of exculpatory testimony. In *State v. Sand,* 731 S.W.2d 488 (Mo.App.

1987), the accused was charged with possession of a controlled substance found in a jacket he was wearing at the time a police officer confronted him. Testifying for the accused, his female companion avowed she had worn the jacket a short time earlier and had placed the substance in it without the accused's knowledge.

In the instant case Sergeant Hamilton testified the automobile into which appellant and Hansen loaded the four containers was registered to Hansen. The prosecutor could have been concerned that a juror would speculate the parcels were Hansen's, that Hansen had enlisted appellant to assist in picking up the parcels at the bus terminal, that Hansen had given appellant the claim checks, and that appellant was unaware the parcels contained marihuana. In such a scenario Hansen would be a potential (albeit unlikely) witness as to appellant's unawareness of the contents. We therefore reject appellant's premise that appellant was the only person whose testimony could establish he did not know the packages contained marihuana. If the prosecutor's comments in *Bohanon,* 747 S.W.2d at 299, constituted a permissible statement that the evidence against the accused was uncontradicted, so did the prosecutor's comments in the instant case. Appellant's contention that the prosecutor's comments constituted a direct reference to appellant's failure to testify is, accordingly, denied.

Judgment affirmed.

HOLSTEIN, C.J., concurs.

GREENE, J., concurs in result and files concurring opinion.

GREENE, Judge, concurring.

I concur fully in regard to the principal opinion's disposition of appellant's points relied on two and three. I concur in result in regard to the principal opinion's disposition of point relied on one. While I believe that the prosecutor's comment in closing argument could possibly be construed as a comment on the failure of Hernandez to testify, I also believe that the trial court's admonishment to the prosecutor, and its

instruction to the jury to disregard the prosecutor's comment was sufficient to cure the possible error without having to resort to the drastic remedy of mistrial.