STATE of Missouri, Respondent,

v.

Joey R. CORPIER, Appellant.

No. WD 40337.

Missouri Court of Appeals,
Western District.

June 5, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 31, 1990.

Application to Transfer Denied
Sept. 11, 1990.

David S. Durbin, Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P.J., and LOWENSTEIN and GAITAN, JJ.

GAITAN, Judge.

Defendant, Joey Ray Corpier, was convicted by a jury of second degree murder, in violation of Mo.Rev.Stat. § 565.021 (1986). Based on the jury's recommendation, the trial court sentenced the defendant to life imprisonment. The defendant filed an appeal of conviction to this Court in February of 1988. Upon notice of the defendant's filing of a Rule 29.15 motion, the Court suspended the appeal pending resolution of the motion. Defendant now reinstates his original appeal although he declines to appeal the motion court's denial of the Rule 29.15 motion without an evidentiary hearing.

The defendant raises fourteen points of alleged trial error which may be summarized as follows: (1) the admission of a confession and physical evidence which were the product of an unlawful arrest; (2) instructional error; (3) the admission of testimony which made improper reference to defendant's post-arrest silence; (4) the admission of inflammatory and prejudicial photographs of the deceased victim; (5) improper expert testimony by the medical examiner; and (6) improper comments by the prosecutor during closing arguments. We affirm.

The defendant does not challenge the sufficiency of the evidence adduced at trial. The evidence showed that on March 14, 1987, John Anderson was killed as a result of gunshot wounds inflicted by the defendant. At the time of the shooting, the victim lived with his wife, Lana, and their four children at a residence northeast of the city of Sedalia, in Pettis County.

At approximately 4 a.m. on March 14, 1987, Deputy Joe Potter of the Pettis County Sheriff's Department was dispatched to the Anderson residence. When he arrived, he found Mrs. Anderson, the four children, and the body of the victim in a hallway of the home. Deputy Potter observed four red, spent .12 gauge shotgun shells near and to the left of the head of John Anderson's body, as well as several shotgun shell waddings near the feet of the body.

On March 15, 1987, between 4 and 5 p.m., Gene Darnell, Sheriff of Lafayette County and officer in charge of the Mid–Missouri Rural Major Case Squad, heard Lana Anderson orally confess that the defendant, Joey Corpier, agreed to kill John Anderson for a price. Based on this information, Deputy Potter was instructed to find and arrest the defendant. While searching for defendant Corpier, Deputy Potter stopped an automobile in which the defendant's wife, Brenda Corpier, was a passenger. At the request of Deputy Potter, Mrs. Corpier accompanied police back to the Sheriff's Department. During the next hour, while still at the department, Deputy Potter received a telephone call from a known informant who told him where the defendant could be found.

At approximately 8 p.m., Deputy Potter, accompanied by another deputy, proceeded to an apartment at 339 Buckner Court in Sedalia. Deputy Potter knocked at the door; a young male, later identified as Larry Tyler, the boyfriend of the lessee of the apartment, Sheila Oldenberg, answered the door. Deputy Potter, not dressed in uniform, identified himself as a deputy sheriff of Pettis County and asked for the defendant. Tyler looked back into the apartment. The deputy could see from his position outside the entry, five or six individuals in the living room area. One of these individuals, a young blondheaded male, raised his hand and said, "I'm Joey Corpier." Upon hearing the defendant's acknowledgment, Deputy Potter reached underneath his coat, cleared his gun from his holster, and held it at his side, pointed at the ground. At the same time, Tyler stepped back from the door. Deputy Pot-

ter stepped approximately three feet into the apartment and stated, "Alright [sic] Mr. Corpier, stand up and keep your hands in plain sight. You're under arrest. Come on outside."

Once outside the apartment, Deputy Potter frisked the defendant, handcuffed him, and informed him that he was under arrest for first degree murder. Defendant Corpier was then transported to the Pettis County Courthouse, where Deputy Potter read and explained to the defendant his *Miranda* rights. At 8:45 p.m., the defendant read and signed a "rights waiver" sheet.

After approximately one hour of interrogation, the defendant signed a consent form, allowing a search of his residence at Lot 19, Homestead Trailer Park in Sedalia. The defendant accompanied several members of the Rural Major Case Squad during their search. The officers found a plug for an Ithaca .12 gauge repeating shotgun, a full box of red .12 gauge shotgun shells, three high velocity, green shotgun shells, and balloon pieces.

The defendant was then taken to the Pettis County Jail for further interrogation. There, at approximately 11 p.m., the defendant confessed to killing John Anderson. In his statement, the defendant stated that for the last month, Lana Anderson had sought to have him kill her husband for ten thousand dollars. The defendant was also approached to kill Anderson by Jimmy Quick, Lana Anderson's boyfriend, who "wanted Lana Anderson for himself." On March 12, a female friend of Lana Anderson's gave the defendant a .12 gauge shotgun and shotgun shells. On Friday, March 13, the defendant, along with Quick and another co-conspirator, Rick Miller, discussed killing Anderson by "blowing up his car." They experimented with Draino, gasoline, and balloons, but gave up the idea when the concoction failed to explode. Later on Friday, Quick spoke with Lana Anderson regarding a plan to kill John Anderson on Saturday, March 14 at approximately 3 a.m. The plan called for John Anderson's throat to be cut, the house to be ransacked, and Quick to engage in sexual intercourse with Lana Anderson to create the appearance of a break-in and rape. The defendant, Quick, and Miller drove to the Anderson residence around 3 a.m. Lana Anderson's pickup truck was not in the driveway. The three men entered the house; John Anderson started up the hallway towards them. The defendant panicked and shot Anderson several times. The three men then fled the home.

After confessing to the Anderson murder, the defendant returned to his residence with officers of the Rural Major Case Squad. The defendant showed the officers where he hid the shotgun, inside a mattress, that was stored in a shed outside of the trailer.

At trial, Jay Dix, the Medical Examiner for Boone County, testified that John Anderson died as a result of four shotgun wounds to the chest, groin, left leg, and left buttock. August Nilges of the Missouri State Highway Patrol testified that the markings on the base of the shell casings found near the victim's body matched the markings made by the breech face and firing pin of the shotgun found in the mattress at defendant Corpier's residence. The defendant did not testify on his own behalf.

I.

■ The defendant contends that the trial court erred in denying his pre-trial motion, preserved by proper objections at trial, to suppress the admission of his confession and physical evidence recovered in his home pursuant to his consent to search; that such evidence was tainted by his illegal arrest.

■ Our review of a ruling on a motion to suppress and the admissibility of evidence at trial is limited to a determination of whether the evidence was sufficient to sustain the trial court's findings. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985); *State v. Luleff*, 729 S.W.2d 530, 533 (Mo. App.1987). The ruling of the trial court was as follows:

THE COURT: Well, the Court finds that he had no expectation of privacy.

This was not his residence. If he had any expectation of privacy, it might have been in the bedroom or something, or if he had hid in there, something like that, but here's a whole bunch of people with a party going on in this house with this fellow there, and he stood up. So I don't have any problem with that at all. I'm satisfied at least that they did not violate his constitutional rights; that he didn't have any expectation of privacy sitting there in the living room with all the other guests, so there's nothing wrong with them taking him into custody. And there was a consent to search, so everything else is all right about it.

The only other problem we have then is the voluntariness of the confession. And the Court finds from the evidence presented that the confession was voluntary and would be admissible. You, of course, can make your objection again, but we won't have to send the jury out and hear this all over again. At least that's my understanding of the law.

 Both our federal and state constitutions protect citizens from unreasonable searches and seizures by requiring authorities to secure a warrant based on probable cause.[1] U.S. Const., amend. IV; Mo. Const. art. I § 15. A basic premise of fourth amendment law is that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton*

v. *New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). In *Payton*, the United States Supreme Court held that the fourth amendment prohibits the police from making warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest, even if probable cause exists. Absent exigent circumstances or consent, the threshold of a dwelling may not be reasonably crossed without a warrant. *Id.* at 590, 100 S.Ct. at 1382.

 In order for *Payton* to be applicable in this case, the defendant has the burden of showing that he had a legitimate expectation of privacy[2] in the apartment in which he was arrested so as to confer upon him standing to challenge the entry and arrest. *Rakas v. Illinois*, 439 U.S. 128, 131, 99 S.Ct. 421, 424, 58 L.Ed.2d 387 (1978). We believe that the defendant has met that burden.

The state, while not specifically citing to *Rakas* or related cases, argues that defendant Corpier's relationship to the 339 Buckner Court apartment did not establish circumstances so as to create a legitimate expectation of privacy.[3] The recent United States Supreme Court decision of *Minnesota v. Olson*, —— U.S. ——, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), is dispositive of this issue. In *Olson*, the police sought the de-

1. We acknowledge that while not always viewed favorably by our courts, warrantless arrests may be valid if they are based on probable cause. *State v. Olds*, 603 S.W.2d 501, 505 (Mo. banc 1980). At the suppression hearing the defendant did not claim that the police lacked probable cause to make a valid warrantless arrest and as such, the trial court made no determination on that issue. Our review of the record indicates that sufficient probable cause existed for a warrantless public arrest. *See State v. Sidebottom*, 753 S.W.2d 915, 925 (Mo. banc 1988); *State v. Craig*, 759 S.W.2d 377, 381 (Mo.App.1988). However, an arrest made by entry into a dwelling without a warrant, even on probable cause, is a different matter because the fourth amendment protects not only a liberty interest, but a privacy interest as well. *State v. Peters*, 695 S.W.2d 140, 143 (Mo.App.1985).

2. Even a subjective expectation of privacy may be legitimate if it is "one that society is prepared to recognize as 'reasonable.'" *Rakas v. Illinois*,

439 U.S. at 143–44, n. 12., 99 S.Ct. at 430–31, n. 12., citing, *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J. Concurring).

3. The state argues that defendant Corpier did not have a key to the apartment, did not receive mail at the apartment, and did not pay rent for the apartment. The Court in *Rakas* noted factors to be considered in determining a legitimate expectation of privacy as: (1) whether the person has key to apartment; (2) kept possessions at the apartment; (3) had control over the apartment; and (4) could exclude others from the apartment. Criteria used by other courts include: (1) intention of parties; (2) length of time; (3) regular or continuous presence; (4) exclusive use of area within residence; (5) whether possessions are stored in residence; (6) receipt of mail; (7) contribution to upkeep of residence; and (8) relationship of blood or marriage. *See People v. White*, 117 Ill.2d 194, 111 Ill.Dec. 288, 294, 512 N.E.2d 677, 683 (1987).

fendant in connection with a robbery-murder. The defendant spent the night at a residence other than his own with the permission of the lessee. The following day the defendant left for a time and then returned to the apartment in the afternoon. Without a warrant, without permission, and with guns drawn, the police entered the residence and placed the defendant under arrest. The Court held that an individual's status as an overnight guest in a home was alone sufficient to show an expectation of privacy in a home that society is prepared to recognize as reasonable; that factors noted in *Rakas* and *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), were not legally determinative; and that a place need not be one's "home" in order to have a legitimate expectation of privacy. *Id.* —— U.S. at ——, 110 S.Ct. at 1686. The Supreme Court's decision was based on the concept that "society recognizes that a houseguest has a legitimate expectation of privacy in his host's home." *Id.*

We recognize that a determination of whether an individual has standing to allege a fourth amendment violation pursuant to *Payton* must be resolved by assessing the specific facts of each case. *See United States v. Sangineto–Miranda*, 859 F.2d 1501 (6th Cir.1988); *United States v. McIntosh*, 857 F.2d 466 (8th Cir.1988); *State v. Adkins*, 346 S.E.2d 762 (W.Va. 1986). The evidence in this case showed that, although married with children, defendant Corpier was engaged in a relationship with a young woman who lived with her mother at 333 Buckner Court. Through his relationship with the girl, the defendant met Larry Tyler, who frequently stayed with his girlfriend, Oldenberg, in her apartment at 339 Buckner Court. Tyler and the defendant became friends and spent a considerable amount of time at the Oldenberg apartment.

The defendant testified at the suppression hearing that Tyler gave him permission to use the apartment for liaisons with his girlfriend. He further stated that he spent three to four nights a week at the apartment; that he and his girlfriend were allowed to use an extra bedroom at the apartment; that he ate at least one meal a day at the apartment; and that he kept a shirt and coat at the apartment. The testimony of Tyler and Oldenberg at trial indicate that the defendant spent a great deal of time at the apartment and was an occasional overnight guest.

On the evening before his arrest, defendant Corpier was present at the apartment. Sometime during the night, the defendant left the apartment and went to his trailer for approximately two to three hours. The defendant then returned to the apartment early the morning of March 15. Other than a short time when he and Tyler left the apartment to buy marijuana, the defendant remained at the apartment until his arrest at 8 p.m.

■■■ The trial court found that the defendant had no expectation of privacy in the apartment because it was not his residence. This finding is clearly erroneous under *Olson*. The trial court further held that even if the defendant had any expectation of privacy, it was diminished because he was in a common area of the apartment with several other persons. We disagree. The fourth amendment protects people not places. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Thus the focus should not be on the area but rather the defendant's actual expectation of privacy and the reasonableness of such. *Id.* at 361, 88 S.Ct. at 516 (Harlan, J. concurring). An individual's legitimate expectation of privacy is not diminished nor determined by the presence of others. Thus an individual may have a reasonable expectation of privacy to be free from unreasonable searches and seizures whether he is alone or if others are present.

It is clear from the facts in this case that the defendant was more than a casual guest or visitor. Therefore, we find that the defendant had a legitimate expectation of privacy in the apartment at 339 Buckner Court and as such has standing to challenge his arrest under the fourth amendment and the requirements set forth in *Payton*.

In concluding that defendant Corpier had a legitimate expectation of privacy in the apartment, our focus turns to whether the unlawful entry was excused under an exception to the warrant requirement. The trial court did not find and the state does not contend on appeal that exigent circumstances existed which excused the lack of a warrant to arrest. We decline to review the issue of exigent circumstances *sua sponte.*

The state does, however, argue that a warrant was not necessary because the deputy had a valid consent to enter the residence; that Tyler consented to the entry of the police when he stepped away from the door. The fourth amendment permits consensual searches conducted without a warrant so long as the consent to search is voluntary and not the product of duress, coercion, or fraud. Whether the consent was voluntary is to be determined by the totality of the circumstances. *State v. Johns,* 679 S.W.2d 253, 261 (Mo. banc 1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). A consent to search may be given by a third party with joint access or control over property, or who has authority to allow entry. *State v. White,* 755 S.W.2d 363, 366–67 (Mo.App. 1988); *State v. Powell,* 728 S.W.2d 622, 625 (Mo.App.1987). When the state seeks to justify a warrantless search on the basis of consent, it must prove by a preponderance of the evidence that the consent was voluntary. *State v. Hernandez,* 776 S.W.2d 34, 38 (Mo.App.1989).

In the instant case the evidence showed that although Deputy Potter identified himself, he failed to provide notice of his purpose to arrest the defendant as required by Mo.Rev.Stat. § 544.200 (1985). *See State v. Peters,* 695 S.W.2d 140, 146 (Mo.App. 1985). The deputy acknowledged at the suppression hearing that no one in the apartment, including Tyler, verbally invited him into the residence. Deputy Potter stated that he interpreted Tyler's action, stepping away from the door, as an invitation to enter.

Given the totality of the circumstances, we hold that insufficient evidence existed to support the trial court's determination that Tyler consented to the entry. The record reflects that Deputy Potter never requested admittance into the apartment or advised Tyler that he had a right under the fourth amendment to refuse the request. *See State v. Witherspoon,* 460 S.W.2d 281, 287–90 (Mo.1970). There is no evidence that Tyler knew or understood that he had such rights. *Id.* at 289. Tyler never verbally consented to the entry. While consent may be nonverbal, *see State v. Powell,* 728 S.W.2d at 625. (appellant's wife did not respond to police questions regarding disturbance but led police into the house), in the present case, the lack of request coupled with no verbal response, vitiates the reasonableness of the deputy's belief that Tyler was "inviting" him into the apartment. Further Deputy Potter drew his gun at approximately the same time that Tyler stepped away from the door, and prior to stepping over the threshold. While consent may still be voluntary after officers have drawn their guns, *see State v. Hernandez,* 776 S.W.2d at 40, after reviewing the circumstances surrounding Tyler's alleged consent, we believe the display of a weapon was a controlling factor in the validity of the consent. In light of the evidence we find that the state failed to meet its burden in demonstrating that the consent was voluntary.

In finding that the arrest inside the apartment was unlawful, the defendant would ask this Court to suppress his confession and the physical evidence obtained after he provided a written consent to search, as fruits of the illegal arrest. This Court declines to do so.

In *New York v. Harris,* —— U.S. ——, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the Supreme Court held that where police have probable cause to arrest a suspect, the exclusionary rule does not bar the state's use of a statement made by the defendant outside his home, even though the statement is taken after an arrest made in the home in violation of *Payton.* In *Harris,* police officers, having probable cause to believe that Harris committed a murder, entered his home without a warrant in

clear violation of *Payton.* While still at the house and after having been advised of his *Miranda* rights, Harris confessed to the murder. The defendant was arrested, taken to the police station, and again given his *Miranda* rights. Harris signed an inculpatory statement. Police then read Harris his *Miranda* rights for a third time and proceeded to videotape an incriminating interview between Harris and a district attorney, although Harris asked to end the interrogation. The first incriminating statement was suppressed as the fruit of the unlawful arrest and the third statement suppressed as a violation of Harris' fifth amendment right. However, the Supreme Court found that the second statement, made at the police station after being informed of his fifth amendment rights, was not the exploitation of an illegal entry, not the product of being in unlawful custody, and not the fruits of being arrested in the home rather than somewhere else.

The Court distinguished *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), cases where evidence was suppressed as fruits of illegal arrests, in that in each of these cases, the police lacked probable cause to make the arrest. Thus the focus was on unlawful detention rather than illegal arrest. The Court further found that the need for an attenuation analysis is only appropriate where the challenged evidence is the product of illegal government activity. In *Harris,* the detention was lawful because police had probable cause, even if the entry into the residence to arrest was illegal. Thus in cases where the evidence is not the product of an exploitation of the defendant's fourth amendment rights, an attenuation analysis is unnecessary.

As previously noted, our review of the record clearly indicates that police had probable cause to arrest defendant Corpier for the murder of John Anderson. The confession and consent to search were free-

ly given by the defendant after voluntarily waiving his *Miranda* rights.[4] The physical evidence obtained from the defendant's trailer was the fruit of a voluntarily provided consent to search. We therefore hold, as in *Harris,* that the police had probable cause to arrest the defendant prior to the unlawful entry and arrest at the apartment, that the defendant's post-arrest detention was lawful, and thus the subsequent confession and consent to search, not obtained at the apartment, were not the fruits of the illegal arrest. The trial court did not err in admitting the confession and physical evidence obtained pursuant to the consent to search.

### II.

In his third point on appeal, the defendant argues that the trial court erred in submitting MAI–CR3d 300.02 and 302.04 because the instructions improperly defined reasonable doubt as doubt that leaves a juror "firmly convinced" of defendant's guilt, therefore reducing the state's burden of proof. The defendant contends that the trial court should have submitted his proffered modified instruction which defined reasonable doubt as doubt that would make a reasonable person hesitate to act in the most important of his own personal affairs.

Our state Supreme Court has held in *State v. Murray,* 744 S.W.2d 762, 771 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988), that the "firmly convinced" language of the instructions, when read as a whole, properly instructs the jury on the required burden of proof. Further, the state's burden is not reduced by such a definition. *E.g., State v. Antwine,* 743 S.W.2d 51, 62 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); *State v. Guinan,* 732 S.W.2d 174, 178 (Mo. banc), *cert. denied,* 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987); *State v. Releford,* 750 S.W.2d 539, 543 (Mo.App.1988). We be-

---

**4.** The defendant does not challenge the voluntariness of his waiver, his confession, or the consent to search.

lieve the above cited cited cases control this issue. The point is denied.

### III.

■ Defendant next contends that the trial court erred in overruling his objection to the testimony of Deputy Potter regarding state's exhibit number four, a shotgun plug. We find this claim without merit.

Following his arrest, defendant Corpier received an explanation of his *Miranda* rights. He signed a "rights waiver" sheet. The defendant also signed a consent form allowing a search of his trailer and premises. During the first search of the residence, Deputy Potter found a plug for an Ithaca brand shotgun. The deputy testified that he picked the plug up and told the defendant that he knew what it was; that he was going to keep it as evidence. The deputy further stated that he commented to the defendant that he assumed that the defendant had taken the plug out of the shotgun to increase its capacity. When asked by the prosecutor how the defendant responded, the deputy stated, "He nodded his head at me." The defendant argues that this testimony was a direct reference to "defendant's post-arrest silence."

■ After an individual has been advised of his *Miranda* rights, no statement he makes may be used against him unless he makes knowing, intelligent, understanding, and voluntary waiver of those rights. *State v. Pierce,* 749 S.W.2d 397, 401–402 (Mo. banc 1988). Once the right to remain silent is waived, the waiver continues unless the right is affirmatively invoked by the defendant. *State v. Antwine,* 743 S.W.2d at 70–71. In the present case, the defendant was informed of his *Miranda* rights both orally and in writing. He signed a written waiver form. We believe that this was nothing less than a knowing and intelligent waiver. *See State v. Stanley,* 741 S.W.2d 813, 815 (Mo.App. 1987). The record does not reflect nor does the defendant assert that he reinvoked his right to remain silent. Defendant's nodding of his head constituted a form of communication. The fact that he chose to communicate nonverbally does not reflect a desire to remain silent. In light of the evidence, we fail to find that the trial court erred in admitting the deputy's testimony or that the testimony was a direct reference to post-arrest silence.

### IV.

■ In his fifth and sixth points of error, the defendant asserts that the trial court erred in admitting into evidence state's exhibits 1, 9, 10, and 11, photographs of the body of the victim, because they were irrelevant and their probative value was outweighed by their prejudicial impact. The defendant further contends that state's exhibit 10 was not a fair and accurate representation of a wound sustained by the victim and therefore, misled the jury as to the amount of damage inflicted by a shotgun blast.

■ A trial court is vested with broad discretion regarding the admissibility of photographs. *State v. Guinan,* 665 S.W.2d 325, 331 (Mo. banc), *cert., denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Photographs are admissible if they are relevant to a material issue. Even if gruesome, photographs may be admitted when they show the nature and location of wounds, when they enable the jury to better understand the testimony, and when they aid in establishing any element of the state's case. *State v. Murray,* 744 S.W.2d at 772.

The victim suffered four gunshot wounds. One to the front left chest with resulting perforation of the left lung; a second wound to the back of the left buttock; a third to the rear, left leg; and a fourth wound to the rear, left scrotum. State's exhibit 1 showed the victim lying face up and revealed the wound to the chest. State's exhibits 9 and 10 showed the victim as he was found, face down in the hallway of the residence. The photographic angle of exhibit 9 was from the head of the body and the photographic angle of exhibit 10 was from the feet. State's exhibit 11 is a photograph of the victim's body after the police rolled it over, and showed the wounds to the front penis, scrotal area.

When a defendant pleads not guilty, the state has the burden of convincing the jury beyond a reasonable doubt as to each element of the offense, including, in a homicide case, the fact that the victim died as a result of defendant's act. *State v. Burton,* 721 S.W.2d 58, 62 (Mo.App. 1986). The fact that there was no dispute as to the cause of death does not prevent the state from having the right to seek the admission of relevant and material evidence. *State v. Clemons,* 643 S.W.2d 803, 805 (Mo. banc 1983). Even though there was oral testimony as to the wounds portrayed in the photographs, this is not reason to deny their admission. *See Murray v. State,* 744 S.W.2d at 772; *State v. Clemons,* 643 S.W.2d at 805.

In the present case, the photographs fairly and accurately depicted the nature and location of the wounds as well as the location where the homicide occurred. While Doctor Dix, the medical examiner of Boone and Calloway counties testified that, after examination, the shotgun blast to the scrotal area proved to be less damaging than what it first appeared, he indicated that the photograph depicted the way the wound appeared upon observation. Further we note that the record reveals that the trial court, with the aid of counsel, attempted to choose photographs which would be appropriate and less gruesome. The photographs admitted into evidence are clearly unpleasant to view. However they do no more than show the results inflicted on a human body when damaged by shotgun blasts, and in this case, accurately depict the wounds. We do not find them inflammatory or prejudicial. The trial court did not error in admitting the photographs into evidence.

### V.

The defendant next contends that the trial court erred in overruling defendant's objection to the expert opinion testimony of Doctor Dix as to whether, after the first wound to his chest, the victim was still alive when he was shot three more times. Specifically, the defendant argues that no evidence existed for the hypothetical question posed to the doctor by the prosecutor.

The record reflects the following exchange:

Q. If you assume two things: If you assume that the chest wound was first, and if you assume that all four shots were fired in rapid succession, do you have an opinion as to whether John was still alive when the second, third and fourth shots were fired?

MR. ROGERS: Once again, your Honor, my objection is that it's an improper hypothetical, and assumes facts not in evidence. There's no evidence of rapid succession.

THE COURT: Come up, please.

(The following proceedings were had outside the hearing of the jury:)

THE COURT: I'm bothered—Isn't that what the confession states? Isn't that what's going to be the evidence?

MR. MITTELHAUSER: That's what I would base that hypothetical on.

THE COURT: That's what I understood. For that reason, it will be overruled. I mean, you're right; it isn't so far, but he's going to connect it up. He doesn't have to put everything in first.

(Proceedings returned to Open Court.)

THE COURT: All right; objection overruled.

Q. (Mr. Mittelhauser) Did I make that question clear?

A. Yes. He was still alive when the second, third and fourth shots were fired.

It is within the trial court's sound discretion whether to admit expert testimony. *State v. Ward,* 745 S.W.2d 666, 671 (Mo. banc 1988). The trial court's discretion is only abused "when the ruling is 'clearly against the logic of the circumstance or when it is arbitrary and unreasonable.'" *State v. Marks,* 721 S.W.2d 51, 55 (Mo.App.1986), *citing, Mathews v. Chrysler Realty Corp.,* 627 S.W.2d 314, 319 (Mo.App.1982). Expert testimony is admissible if it is clear that the subject of testimony is one which the jurors, for want

of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from facts in evidence. *State v. Lawhorn*, 762 S.W.2d 820, 822 (Mo. banc 1988). When a hypothetical question is used to elicit an opinion, the question must be based on material facts in evidence and those facts must be fairly presented. *State v. Guyton*, 635 S.W.2d 353, 360 (Mo. App.1982).

Deputy Potter testified in response to questions posed by defense counsel on cross-examination, that in his opinion, the first shot fired was the shot to the chest; that the effect of the blow to the chest was to spin the body around, at which time the other shots fired struck the victim in the groin and buttock areas. The defendant, in his confession which was admitted into evidence, stated that, "I started shooting. I think I shot several times at him." Evidence existed to support the hypothetical question. Therefore, the trial court did not err in allowing the question. Point denied.

## VI.

■■■■ In his final seven points on appeal, the defendant claims that the trial court erred in failing to sustain objections offered by defense counsel to various statements made by the prosecutor during closing argument. Our review recognizes that a trial court has broad discretion in controlling closing arguments and wide latitude may be accorded counsel for their summations. *State v. Schwer*, 757 S.W.2d 258, 263 (Mo.App.1988). The ruling of the trial court will be reversed only for an abuse of discretion which is prejudicial to the accused. *State v. Biddy*, 748 S.W.2d 794, 800 (Mo.App.1988).

### A.

■■■ The defendant asserts that on three separate occasions, the prosecutor made "direct and certain" reference to the defendant's failure to testify. The first instance allegedly occurred when the prosecutor stated that the evidence that defendant caused the death of John Anderson was "uncontradicted and uncontroverted."

The second allegedly occurred when the prosecutor told the jury:

I think I called nine or ten witnesses to testify over the course of the trial, and there was one witness that I would like to have called who was unavailable to testify.

The third occasion occurred when the prosecutor argued the following:

I wish the defendant wasn't in this position. I wish that these young ladies had not been abused by Roscoe Corpier. That's a sad fact; and I wish that the defendant did not have to view that. But to hear him say, I'm sorry Mrs. Anderson about killing your son, but you see, I had a bad childhood—

■■■■ A prosecutor may not refer directly to a defendant's failure to testify. *State v. Sidebottom*, 753 S.W.2d 915, 920 (Mo. banc 1988). A direct reference to a failure to testify is made when words such as "defendant," "accused," and "testify", or their equivalent, are used. *State v. Lawhorn*, 762 S.W.2d at 826. An indirect reference is one that is "apt to direct the jury's attention to the defendant's failure to testify." *Id.* A direct reference generally is reversible error. However, an indirect reference will only be improper, thereby warranting reversal, if the prosecutor demonstrated calculated intent. *Id.; State v. Wood*, 719 S.W.2d 756, 761 (Mo. banc 1986).

Our courts have held that stating that evidence is "uncontradicted" is not a direct and certain reference. *State v. Robinson*, 641 S.W.2d 423, 426 (Mo. banc 1982); *State v. Hunter*, 750 S.W.2d 134, 137 (Mo.App. 1988); *State v. Gardner*, 743 S.W.2d 472, 473 (Mo.App.1987). In the present case, the defendant called numerous witnesses to testify regarding his alcoholism and the emotional as well as physical abuse he suffered as a child. However, none of the evidence presented by the defendant disputed the state's evidence in regard to the actual events surrounding Anderson's death. It is clear that the prosecutor's comments as to "uncontroverted" or "uncontradicted" evidence were permissible references to evidence presented at trial

and not direct or intentional references to defendant Corpier's failure to testify.

The record reflects that the prosecutor's remarks regarding a witness unavailable to testify was a reference to the victim, and that both judge and counsel recognized the reference as such. We fail to find that the prosecutor's comments were a direct reference to defendant's silence, and believe that even if they were an indirect reference, the record fails to demonstrate any calculated intent by the prosecutor.

■ In determining whether the trial court abused its discretion in controlling closing arguments, we review the comments in the context of the entire trial to determine whether error occurred. *See U.S. v. Lewis,* 759 F.2d 1316, 1349–50 (8th Cir.1985). The prosecutor's comment in reference to the defendant's "bad childhood" was an argument based on evidence presented at trial. The record indicates that the primary trial tactic of the defendant was to explain his conduct and to cast doubt upon his capacity to understand that his conduct would cause the victim's death, through testimony regarding the defendant's unfortunate childhood.

In reviewing the record as a whole, we find that the prosecutor's use of the words, "to hear him say" was merely a misstatement and not a direct reference to the defendant's failure to testify. If the prosecutor's comment rose to the level of an indirect reference, we fail to find that it was intentional or prejudicial. For these reasons, we find that the trial court correctly overruled the defendant's objections.

### B.

■ The defendant next contends that the prosecutor improperly personalized his argument as well as injected the character and worth of the victim for the jury's consideration in assessing the defendant's responsibility. The allegedly improper remarks were as follows:

> This is a first degree murder case; and we're talking about John Anderson and his life and how it was taken, and if I were to ask any of you to tell me what a person's life is worth—

MR. ROGERS: I object to the personalizing.

THE COURT: Overruled.

MR. MITTELHAUSER: —it would behoove you to do it. It would be impossible for moral, law-abiding citizens to put a dollar value on a human life. It wasn't impossible for that man. Ten thousand dollars. That's how much human life was worth to him. That's how much he wanted in order to go out and gun down John Anderson in his home. And after you have considered all the evidence, you will be firmly convinced that that man is guilty of murder in the first degree.

■ A prosecutor may argue any inferences reasonably drawn from the evidence that he believes in good faith to be justified. *State v. Clemmons,* 753 S.W.2d 901, 909 (Mo. banc), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988); *State v. Ward,* 745 S.W.2d at 672. The evidence adduced by the state indicated that the defendant agreed to murder John Anderson for a price of ten thousand dollars. This Court fails to find that the prosecutor was personalizing the case to the jury or that he was attempting to mislead the jury from its proper consideration. Rather we believe that the prosecutor's remarks made direct reference to evidence presented in the case, were within the bounds of closing argument, and had no prejudicial effect on the jury.

■ In the same light, we find that the defendant's assertion that the trial court erred in overruling an objection to the prosecutor's argument regarding what facts the defendant's psychologist did not consider in concluding that defendant Corpier lacked the capacity to emotionally appreciate the results of his conduct, is without merit.

The facts referred to by the prosecutor were the specific factual descriptions of the events leading up to and including the murder of the victim which were contained in defendant's confession. The defendant's expert witness, William O'Connor, a psychologist, testified that in reaching his decision as to the defendant's emotional condi-

tion, he gave the statement very little weight; that his determination came from his interview with the defendant and test results. The prosecutor's argument was merely a reasonable inference drawn from the evidence. *State v. Clemmons,* 753 S.W.2d at 909. The trial court properly overruled the defendant's objection.

### C.

The defendant alleges that the trial court erred in overruling the defendant's objection to the prosecutor's argument that defense counsel was attempting to "set up what is often called an insanity defense." At trial, defendant made a general objection. The trial court sustained the objection as to what the defense is often called.

The defendant's objection was sustained and he failed to request further relief. This Court therefore, assumes that the corrective action taken by the trial court was adequate, and whereas the defendant received the relief requested, he cannot now claim error. *State v. Mitchell,* 751 S.W.2d 65, 67 (Mo.App.1988). Point denied.

### D.

In his final claim of improper prosecutorial argument, the defendant asserts that the trial court erred in overruling his objection to the prosecutor's statement that the state was not required to prove that the defendant appreciated what he was doing; that the state was not required to prove that the defendant calculated the consequences of his actions.

We recognize that counsel should refrain from informing the jury about the law in closing argument. *State v. Robinson,* 696 S.W.2d 826, 833 (Mo.App. 1985). However, this general rule does not preclude all mention of the law in arguments; counsel may discuss the law without defining it and without stating any law applicable to the case which is not contained in the instructions. *Id.* at 833–34. Unless the trial court abuses its discretion by permitting argument calculated either to mislead as to prejudice or to conflict with the instructions, the reviewing court

will not intervene. *State v. Payne,* 600 S.W.2d 94, 97 (Mo.App.1980).

MAI–CR3d 313.04, Murder in the Second Degree, requires the jury to find that the defendant knew he was causing or practically certain to cause the death of the victim. Testimony by Doctor O'Connor indicated that defendant Corpier had the capacity to understand that if he shot John Anderson, it could kill him, but that he did not have the capacity to appreciate the results or consequences of that action. We believe the prosecutor did not attempt to define the law, but merely attempted to distinguish the psychologist's testimony regarding the defendant's emotional state. This did not shift the state's burden of proof and was a permissible reference to evidence presented at trial. *State v. Clemmons,* 753 S.W.2d at 909.

The judgment is affirmed.

All concur.